J-S38001-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1287 EDA 2023 |

Appeal from the Order Entered April 21, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000210-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: C.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1288 EDA 2023 |

Appeal from the Decree Entered April 21, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000502-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: A.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.S., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1289 EDA 2023 |

Appeal from the Order Entered April 21, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000211-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: A.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

                                  :
                                  :

APPEAL OF: P.S., FATHER         :
                                  :
                                  :
                                  :
                                  :    No. 1290 EDA 2023

Appeal from the Decree Entered April 21, 2023
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000503-2022

BEFORE:   LAZARUS, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY LAZARUS, J.:        **FILED NOVEMBER 1, 2023**

P.S. (Father) appeals from the decrees,[1] entered in the Court of Common Pleas of Philadelphia County, Juvenile Division, involuntarily terminating his parental rights to his two minor children, C.R. (born 10/2014) and A.R. (born 5/2018) (collectively, Children). After careful review, we affirm.

In 2019, Philadelphia Department of Human Services (DHS) first became involved with Children when it received a general protective services (GPS) report that Children's Mother was homeless, transient, and providing inadequate care for Children. After further investigation, DHS discovered that Mother was also unemployed, receiving mental health treatment for bipolar

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Father has complied with the dictates of **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), by filing separate notices of appeal for each trial court docket number. **See id.** (holding "where a single order resolves issues arising on more than one docket, separate notices of appeal must be filed for each of those cases"). On June 15, 2023, this Court consolidated the appeals *sua sponte*. **See** Pa.R.A.P. 513.

disorder and depression, and was residing with Children in her paramour's home. Both C.R. and A.R. have special needs requiring therapeutic services and visits with medical specialists.[2]

On July 10, 2019, an order of protective custody was obtained for Children. On August 29, 2019, the Community Umbrella Agency (CUA) implemented in-home services for Mother, providing her with assistance for Children and "some alternate things that she needed for the baby." N.T. Termination Hearing, 4/21/23, at 79. Mother was also advised to do parenting, domestic violence, and health relationships training; devise a budget plan; provide proof of income; and to ensure that Children were attending school and all medical, dental, and specialist appointments. *Id.* at 79. An adjudicatory hearing was held on February 21, 2020; Father's whereabouts were unknown at the time of the hearing. Following the adjudicatory hearing, Children were adjudicated dependent, legal custody of Children was transferred to DHS, and Children were placed into pre-adoptive foster homes.[3] *Id.* DHS subsequently conducted a parent locator search for Father; Father eventually made his whereabouts known to CUA.

DHS devised a single case plan for Father that included: completion of a Behavioral Health Services (BHS) evaluation; Achieving Reunification Center

---

[2] Mother failed to take Children to necessary medical appointments.

[3] Two years after their initial placement, A.R was placed with C.R. in current foster parents' home. *Id.* at 121-22.

(ARC) for parenting; signing releases and consents; attending Children's medical appointments; participation in weekly, supervised visits; attending family school; giving DHS access to Father's home for assessments; and providing proof of housing and income. *Id.* at 86-88. Father has an IQ of 64 and resides with paternal aunt who is his caregiver. *Id.* at 100-01, 153.

Since February 2020, Father has provided no care or financial support to Children. Father has also not sent any letters to Children or inquired about their wellbeing. *Id.* at 89. At the time of the termination hearing, Father was receiving SSI and was working part-time. While Father completed BHS and psychological evaluations and had been compliant with his weekly supervised visits, Case Management Director Jessica Estevez testified that, overall, Father had neither complied nor progressed with his case plan. *Id.* at 88. Father's visits with Children never progressed to unsupervised due to concerns about his ability to keep Children safe.

Children have been in the care of DHS since February 21, 2020—over three years at the time of the termination hearing. Children do not look to Father as a caregiver or someone who will provide them with care and comfort. *Id.* at 90. Case Management Director Estevez testified that although Children enjoy their visits with Father, they do not share a parent-child bond with him and would not suffer irreparable harm if Father's parental rights were terminated. *Id.* at 92.

On the other hand, Children have established a close relationship with their foster parents, are bonded with them, and look to them to provide care

- 4 -

and comfort as well meet their emotional and medical needs. *Id.* at 90-91. *See id.* at 91 (case management director testifying Children call foster parents "Mom" and "Dad"); *id.* at 136 (CUA case manager testifying foster parents keep Children safe, meet their "basic needs," and take them to them "medical, dental[,] and vision" appointments). Both C.R. and A.R. wish to be adopted by foster parents. *Id.* at 104. Children are thriving in foster parents' care. *Id.* at 104-05. Finally, foster parents have agreed to maintain contact with Father in the event his parental rights are terminated. *Id.* at 133; *see* 23 Pa.C.S.A. § 2731 (Act 101).

On August 22, 2022, DHS filed petitions to involuntarily terminate Father's parental rights to Children. On April 21, 2023, the trial court held a termination hearing[4] at which Mother, CUA Case Management Director Jessica Estevez, and CUA Case Manager Sandra France testified. Following the hearing, the court entered a decree involuntarily terminating Father's parental

_____

[4] Children were represented by guardian *ad litem*, Gracen Eiland, Esquire, and Child Advocate, Carla Beggin, Esquire, at the termination hearing. *See* 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and *In re K.R.*, 200 A.3d 969 (Pa. Super. 2018) (en banc); *but see In Re: T.S., E.S.*, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

rights to Children under subsections 2511(a)(1)-(2), (5), (8), and (b) of the

Adoption Act.[5]

On appeal, Father presents the following issues and sub-issues for our

review:

(1)     Did the [t]rial [court] rule in error that the Philadelphia City
Solicitor's Office me[t] its burden of proof [to show] that
Father's parental rights to his children [should] be
terminated[?]

(1A) Did the [t]rial [c]ourt [] abuse its discretion
and commit legal error in terminating [Father's]
parental rights since the D[HS] did not meet its
burden by clear and convincing evidence of
establishing sufficient grounds that [F]ather has
evidenced a settled purpose of relinquishing
claim to [Children] or has refused or failed to
perform parental duties under 23 P[a].C[.]S.A. §
2511(a)(1)[?]

(1B) Did the [t]rial [c]ourt [] abuse its discretion
and commit legal error in terminating [Father's]
parental rights since the D[HS] did not meet its
burden by clear and convincing evidence of
establishing sufficient grounds under 23
P[a].C.S.A. § 2511(a)(2) that [F]ather lacks the
present capacity to perform h[is] parental
responsibilities[?]

(1C) Did the trial court abuse[] its discretion and
commit[] legal error in terminating [Father's]
parental rights under 23 P[a].C.S.A. §
2511(a)([2]) because the D[HS] failed to
prove[,] by clear and convincing evidence[,] the
present and continued incapacity of [F]ather to

_____

[5] 23 Pa.C.S.A. §§ 2101-2938.

provide essential care necessary for h[is] [Children's] physical and mental wellbeing[?]

\* \* \*

(1[E]) Did the [t]rial [c]ourt abuse[] its discretion and commit[] legal error in terminating [Father's] parental rights under 23 P[a].C.S.A. § 2511(a)(8)[?⁶]

(1[F]) Did the [t]rial [c]ourt err in terminating [Father's] parental rights since the D[HS] did not meet its burden by clear and convincing evidence of showing that the best interest of [Children] was served by terminating [F]ather's parental rights pursuant to [23 Pa.C.S.A.] 2511(b) of the Adoption Act[?]

(2) Did the trial judge rule in error that it was in [Children's] best interest for the goal to be changed to adoption[?]

Father's Brief, at 7-8.

In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

**In re Adoption of S.M.**, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation and quotation marks omitted). We review a trial court's decision to

_____

⁶ Father repeats sub-issues (1C) and (1D) in his Statement of Questions Involved. However, in the argument section of his brief, Father correctly cites to subsection 2511(a)(8) and argues the specifics of that subsection. **See** Father's Brief, at 18-19. Father also duplicates entire portions of his argument for several issues. **See id.** at 12-14, 15-17

involuntarily terminate parental rights for an abuse of discretion or error of law. **In re A.R.**, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. **Id.**

Termination of parental rights requires a two-step analysis. First, the party seeking termination must prove by clear and convincing evidence that the parent's conduct meets at least one of the grounds for termination set forth in section 2511(a). **In re L.M.**, 923 A.2d 505, 511 (Pa. Super. 2007). Under subsection 2511(a)(1), parental rights may be terminated where "[t]he parent[,] by conduct continuing for a period of at least six months immediately preceding the filing of the petition[,] either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S.A. § 2511(a)(1). It is well-established that a parent must "act affirmatively to maintain his relationship with his child, even in difficult circumstances." **In re B., N.M.**, 856 A.2d 847, 855 (Pa. Super. 2004).

If grounds for termination are established under subsection 2511(a), the court must then determine whether termination would be in the best interest of the child, considering his or her developmental, physical, and emotional needs and welfare, pursuant to subsection (b). **See In re Adoption of S.P.**, 47 A.3d 817, 827-30 (Pa. 2012). "Common sense dictates that courts considering termination must also consider whether the children

are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013).

After a comprehensive review of the parties' briefs, relevant case law and statutes, and the certified record—in particular the notes of testimony from the termination hearing—we affirm the trial court's decrees based upon the opinion authored by the Honorable Cateria R. McCabe. The trial court properly determined that there was clear and convincing evidence to establish that Father failed to perform his parental duties for at least six months prior to the filing of the termination petition. *See* 23 Pa.C.S.A. § 2511(a)(1).[7] Moreover, DHS proved that terminating Father's parental rights would be in Children's best interests where Children are thriving emotionally, socially, and physically in their pre-adoptive foster home, have a bond with foster parents, and Children have expressed their preference for adoption. *See* 23 Pa.C.S.A. § 2511(b). We instruct the parties to attach a copy of Judge McCabe's decision in the event of further proceedings in the matter.

Decrees affirmed.

_____

[7] "We need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights." *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004).

Judgment Entered.

Benjamin D. Kohler

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>11/01/2023</u>

Received 6/14/2023 10:50:09 PM Superior Court Eastern District

Filed 6/14/2023 10:50:00 PM Superior Court Eastern District
1288 EDA 2023

S 38001-23
TCO

IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION - DEPENDENCY BRANCH

IN RE:

| | | |
|---|---|---|
| C.R., a minor, D/O/B: 10/ /2014 | : | CP-51-DP-0000210-2020 |
| | : | CP-51-AP-0000502-2022 |
| A.R., a minor, D/O/B: 05/ /2018 | : | CP-51-DP-0000211-2020 |
| | : | CP-51-AP-0000503-2022 |
| | : | |
| | : | 51-FN-000284-2020 |
| | : | |
| | : | Superior Court No. 1287 EDA 2023 |
| | : | Superior Court No. 1288 EDA 2023 |
| | : | Superior Court No. 1289 EDA 2023 |
| APPEAL OF: P.S., Father | : | Superior Court No. 1290 EDA 2023 |

## OPINION

### I.   INTRODUCTION

P.S., ("Father"), appeals from the Order entered by this Court on April 21, 2023, involuntarily terminating his parental rights as to his Children: C.R., born October ´  2014, and A.R., born May    , 2018 ("the Children"). Testimony for the Goal Change and Termination of Parental Rights Hearings occurred during the April 21, 2023, hearing, attached hereto as Court's Exhibit A. At the conclusion of the hearing, the trial court found clear and convincing evidence to involuntarily terminate Father's parental rights pursuant to the Adoption Act, 23 Pa. C.S.A. §2511(a)(1), (2), (5), (8) and §2511(b) and changed the Children's permanency goals to adoption pursuant to the Juvenile Act, 42 Pa. C.S.A. §6351. For the following reasons, this Court's decision should be affirmed.

### II.   FACTUAL and PROCEDURAL HISTORY

The relevant facts and procedural history of this case are as follows. The Philadelphia Department of Human Services (DHS) became aware of this family on July 10, 2019, when it

1

received a General Protective Services (GPS) report alleging that the Children and Mother were homeless and that Mother was not providing appropriate care for the Children. (N.T. 4/21/2023, p. 77 at 19-21 (Exhibit A)); (Statement of Facts Petition to Terminate Parental Rights Paragraph B, hereinafter Statement of Facts). The GPS report alleged that Mother frequently allowed the Children to remain in soiled diapers for long periods of time, and failed to provide them with adequate food, diapers, and baby wipes. The report also alleged that when Mother left the home, she utilized the Children's older sibling, B.R., as a caregiver for the Children. B.R. was nine years old at the time. The GPS report further alleged that the Children were dirty, malodorous, and appeared to be unbathed for days. The report also indicated that A.R. had autism. The GPS report was determined to be valid. Id.

On August 29, 2019, Community Umbrella Agency (CUA) implemented In-Home Services (IHS) for the family to address the Children's medical needs. (N.T. 4/21/2023, p. 78 at 1-18 (Exhibit A)). Mother's paramour, F.A., agree to be the safety provider for the family. DHS developed a Safety Plan which all parties signed. (Statement of Facts Paragraphs D and E). During a home visit on September 6, 2019, Mother stated that C.R. received Early Intervention Services through Elwyn. CUA recommended that A.R. also receive Early Intervention Services. At this visit, Mother stated that she had a disability and was unable to read. (Statement of Facts Paragraph F).

CUA held an initial Single Case Plan (SCP) meeting on September 19, 2019. The permanency goal for the Children was to stabilize the family. At that time, the parental objectives for Mother were to attend to the well-being of the Children, ensure academic excellence, attend to her own mental health and intellectual disabilities, and to obtain stable housing. The parental objectives for Father were to make his whereabouts known to CUA. (Statement of Facts Paragraph G).

On January 15, 2020, CUA conducted an unannounced visit at the home where Mother, F.A., and the Children were present. CUA observed that there was minimal food in the home and that the toilet and bedroom doorknobs were broken. CUA also observed that the Children did not have any clean clothes, even though the family had a washing machine and dryer in the basement. Their clothes were stored in trash bags. F.A. initially indicated that no one else resided in the home, but he and Mother later admitted that several relatives stayed in the home regularly. (Statement of Facts Paragraph L).

DHS filed a Dependency Petition on behalf of the Children and their sibling, B.R., on February 10, 2020. On February 21, 2020, the Children were adjudicated dependent based on present inability and fully committed to DHS. (N.T. 4/21/2023, p. 79 at 22-25 (Exhibit A)). A Parent Locator Search (PLS) was ordered to be conducted for Father as his whereabouts were unknown. (N.T. 4/21/2023, p. 81 at 15-18 (Exhibit A)); (See Trial Court Order 2/21/20).

Father was located and SCP objectives were established for him at the March 5, 2020, SCP meeting. The permanency goal for the Children was reunification. Father's objectives were to comply with court orders, promote reunification, attend to his mental health and intellectual disabilities, and to provide proof of stability. (Statement of Facts Paragraph N).

Following the Adjudicatory Hearing, Permanency Review Hearings were held regularly. At the September 9, 2020, Initial Permanency Review Hearing, this Court ordered that a paternity test be conducted for Father. At the October 30, 2020, Permanency Review Hearing, genetic testing confirmed that Father was the biological father of the Children. He was excluded as the biological father for their sibling, B.R. Father was also referred for a BHS evaluation and/or consultation to include IQ testing as well as to ARC for appropriate services at this hearing. Both Mother and Father were ordered to be referred for Family School when appropriate. Mother and Father's visits with the Children remained supervised at the CUA agency once per week. (See Trial Court Order

10/30/2020). Father was later referred for IDS as well as a Parenting Capacity Evaluation (PCE) at the October 25, 2021, Permanency Review Hearing. (See Trial Court Order 10/25/2021).

On August 22, 2022, DHS filed petitions to change the goal from reunification to adoption and to involuntarily terminate Father's parental rights to the Children. The Termination of Parental Rights and Goal Change Hearing (hereinafter the "TPR hearing") was held on April 21, 2023.[1] At the TPR hearing, the Court heard testimony from CUA Case Management Director, Ms. Jessica Estevez. (N.T. 4/21/2023, p. 77-135 (Exhibit A)). Ms. Estevez stated that she had been the assigned CUA Director for this case since November 29, 2021. (N.T. 4/21/2023, p. 77 at 16-22 (Exhibit A)). She testified that she reviewed the CUA case file when the case assigned was first assigned to her in 2021 as well as in preparation for the TPR hearing. (N.T. 4/21/2023, p. 77 at 23-25; p. 78 at 1-3 (Exhibit A)). Ms. Estevez also testified that as the CUA Director assigned to this case, she maintained the CUA case record. (N.T. 4/21/2023, p. 78 at 4-6 (Exhibit A)). Ms. Estevez testified that the Children became known to DHS following a GPS report which alleged Mother was homeless, that Mother was inappropriately caring for the Children, and that they lacked food, diapers, and other articles for younger children. Id. at 18-21. Ms. Estevez also testified that the Children have remained in foster care continuously since February 21, 2020, when they were adjudicated dependent and fully committed to DHS. (N.T. 4/21/2023, p. 80 at 16-24 (Exhibit A)). She further testified that Father did not attend the adjudicatory hearing for the Children as his whereabouts were unknown. Id. at 13-15. Ms. Estevez stated that neither Mother nor Father had cared for either of the Children since February 2020. (N.T. 4/21/2023, p. 80 at 25; p. 81 at 1-5 (Exhibit A)).

---

[1] At this hearing, the Court first held a Permanency Review Hearing as to the Children's sibling, B.R. Testimony was incorporated by reference as applicable to the TPR Hearing.

4

Ms. Estevez testified that a Parent Locator Search (PLS) was ordered for Father at the Adjudicatory Hearing. (N.T. 4/21/2023, p. 81 at 15-18 (Exhibit A)). Once Father made his whereabouts known to CUA, Single Case Plan ("SCP") objectives were established to facilitate reunification with him. Father's SCP objectives were to complete a BHS evaluation to include Intelligence Quotient (IQ) testing; complete a CEU assessment; attend ARC for parenting, housing, and employment; sign all necessary consents and releases; attend medical appointments for the Children; participate in supervised visits and attend Family School; allow CUA to complete a home assessment; and provide proof of income. (N.T. 4/21/2023, p. 86 at 15-21; p. 101 at 10-13 (Exhibit A)). Father's SCP objectives have essentially remained the same throughout the case. (N.T. 4/21/2023, p. 95 at 23-25; p. 96 at 1-2 (Exhibit A)). Ms. Estevez testified that Father was noncompliant with his SCP objectives and made no progress toward reunification with the Children. (N.T. 4/21/2023, p. 88 at 16-22 (Exhibit A)).

Regarding Father's mental health SCP objective, Ms. Estevez testified that Father completed a BHS evaluation. It recommended that he receive mental health services as well as IDS. She further testified that that CUA had no record of Father ever attending mental health services despite requesting documentation from Father throughout the case. (N.T. 4/21/2023, p. 86 at 22-25; p. 87 at 1-2 and 7-9 (Exhibit A)). The testimony also reflects that Father resides with his sister who acts as his full-time caregiver because of his mental health concerns. (N.T. 4/21/2023, p. 100 at 19-25 (Exhibit A)). Additionally, Father was referred for IDS, but the testimony reflects that he did not complete this objective. (N.T. 4/21/2023, p. 96 at 7-12; p. 101 at 7-9 (Exhibit A)). The testimony also reflects that Father completed a psychological evaluation in March 2021. It determined that Father had an IQ of around 64. (N.T. 4/21/2023, p. 101 at 1-6 (Exhibit A)).

Father was also ordered to complete a PCE as part of his SCP objectives. Ms. Estevez testified that she referred Father for a PCE in 2021 but was never provided with an assessment date. Father

remains on the waiting list and this SCP objective remains outstanding. (N.T. 4/21/2023, p. 98 at 2-10 (Exhibit A)).

Father was also referred to ARC for parenting, housing, and employment as a part of his single case plan. Ms. Estevez testified that Father was referred for ARC services, but that he did not engage in any ARC services. (N.T. 4/21/2023, p. 87 at 10-12; p. 101 at 10-16; p. 109 at 12-24 (Exhibit A)). Father was also ordered to complete Family School, but the testimony reflects that he was discharged from Family School in 2022 due to noncompliance. (N.T. 4/21/2023, p. 101 at 17-19 Exhibit A)).

Father was also ordered to provide proof of employment and housing as a part of his SCP objectives. Ms. Estevez testified that Father never provided CUA with proof of employment despite CUA's requests throughout the case. (N.T. 4/21/2023, p. 88 at 11-15 (Exhibit A)). Ms. Estevez further testified that she completed a home assessment of Father's current home. She indicated that although the home was undergoing renovations, it was otherwise appropriate. Id. at 3-10. Father resides with his sister, who is his full-time caregiver due to his mental health concerns. (N.T. 4/21/2023, p. 100 at 19-25 (Exhibit A)).

Father's SCP objectives also included signing consents and releases for the Children as well as attending their medical appointments. There have not been any consents or releases needed for Father to sign. (N.T. 4/21/2023, p. 87 at 13-17 (Exhibit A)). Ms. Estevez also testified that Father has never attended any medical appointments for the Children. Id. at 18-20.

When asked about Father's visitation with the Children, Ms. Estevez testified that Father's visits are supervised weekly at the CUA agency. She testified that Father was compliant with visiting the Children. (N.T. 4/21/2023, p. 87 at 21-25; p. 88 at 1-2 (Exhibit A)). Father's visits have never progressed to unsupervised due to concerns for Father's ability to keep the Children

safe. Ms. Estevez testified that these concerns continue to exist (N.T. 4/21/2023, p. 100 at 16-18 (Exhibit A)).

Regarding Father's relationship with the Children, Ms. Estevez testified that Father has never contacted CUA to inquire about the Children's wellbeing. (N.T. 4/21/2023, p. 88 at 23-25; p. 89 at 1 (Exhibit A)). She testified that Father has never provided any financial support or letters to the Children throughout the case. Ms. Estevez also testified that she was not sure if Father has ever provided the Children with birthday cards or gifts. (N.T. 4/21/2023, p. 89 at 2-9 (Exhibit A)). When asked whether the Children share a parental bond with Father, Ms. Estevez testified that she believes they know he is their Father. (N.T. 4/21/2023, p. 89 at 25; p. 90 at 1-3 (Exhibit A)). However, Ms. Estevez further testified that the Children do not look to Father as a caregiver, nor do they look to him to meet their daily medical and emotional needs. (N.T. 4/21/2023, p. 90 at 7-8 and 12-13 (Exhibit A)). Similarly, Ms. Estevez testified that the Children do not look to Father for care and comfort. Id. at 17-19. Ms. Estevez stated that while the Children enjoy their visits with Mother and Father, they do not share a parent-child bond with them. (N.T. 4/21/2023, p. 103 at 19-23 (Exhibit A)). The testimony also reflects that Father never attended any of the Children's medical appointments. (N.T. 4/21/2023, p. 102 at 18-22 (Exhibit A)).

Ms. Estevez testified that the Children would not suffer irreparable harm if Father's parental rights were terminated. (N.T. 4/21/2023, p. 92 at 5-7 (Exhibit A)). She testified that the Children have established a close relationship with their foster parents as well as their extended family and that they share a parent-child bond with the foster parents. (N.T. 4/21/2023, p. 90 at 20-25; p. 91 at 1; p. 103 at 12-18 (Exhibit A)). Ms. Estevez testified that C.R. has resided with these foster parents since she was adjudicated dependent. A.R. has resided there since being placed there in August 2022. (N.T. 4/21/2023, p. 101 at 20-25; p. 102 at 1-3 (Exhibit A)). She stated that the Children call the foster parents "mom" and "dad." (N.T. 4/21/2023, p. 91 at 2-5 (Exhibit A)).

7

Ms. Estevez also testified that the Children look to the foster parents to meet their daily emotional and medical needs as well as for love, support, care, and comfort. She also stated that the foster parents provide the Children with safety and stability. Id. at 9-14. The testimony further reflects that the Children have complex medical and therapeutic needs, which the foster parents have attended to since placement. (N.T. 4/21/2023, p. 102 at 10-11 (Exhibit A)). This is a pre-adoptive home for the Children. (N.T. 4/21/2023, p. 89 at 20-21 (Exhibit A)). Ms. Estevez testified that it is in the Children's best interests for Father's parental rights to be terminated and for their permanency goal to be changed to adoption. (N.T. 4/21/2023, p. 92 at 13-20 (Exhibit A)).

At the April 21, 2023, hearing, the Children's TPR Counsel stated that she spoke to the Children about permanency. She indicated that the Children are very happy in the home and are bonded with the foster parents. While she indicated that the Children did not understand the concept of adoption, they understood the meaning of a forever home. TPR Counsel indicated that the Children wished for the foster parents' home to be their forever home. (N.T. 4/21/2023, p. 162 at 2-12 (Exhibit A)).

On April 21, 2023, this Court involuntarily terminated Father's parental rights to the Children, C.R. and A.R., pursuant to 23 Pa. C.S.A. §2511(a)(1), (2), (5), and (8). In accordance with 23 Pa. C.S.A. §2511(b), this Court found that termination of Father's parental rights best served the developmental, physical, and emotional needs and welfare of the Children. Father filed this Notice of Appeal and a Concise Statement of Errors Complained of on Appeal on May 20, 2023.[2]

---

[2] Counsel for Father filed four separate Notices of Appeal on May 20, 2023, one for each of the Children as to the TPR and Goal Change to Adoption. Father's Notices of Appeal state essentially the same errors for each child. The matters are related and arise out of the same facts and circumstances. Thus, a single submission from the Trial Court is most appropriate to avoid duplication.

## III. STATEMENT OF MATTERS COMPLAINED ON APPEAL

In the Pa. R.A.P. 1925(b) Concise Statement of Matters Complained of on Appeal, the

Appellant identifies the following issue(s), which are stated verbatim[3]:

1. The Trial Court did abuse its discretion and commit legal error in terminating mother's parental rights since the Department of Human Services did not meet its burden by clear and convincing evidence of establishing sufficient grounds that mother has evidenced a settled purpose of relinquishing claim to a child or has refused or failed to perform parental duties under 23 PA.C.S.A. §2511(a)(1).

2. The Trial Court did abuse its discretion and commit legal error in terminating mother's parental rights since the Department of Human Services did not meet its burden, by clear and convincing evidence of establishing sufficient grounds under 23 PA.C.S.A. §2511(a)(2) that mother lacks the present capacity to perform her parental responsibilities.

3. The Trial Court abused its discretion and committed legal error in terminating mother's parental rights under 23 PA.C.S.A. §2511(a)(5) because the Department of Human Services failed to prove by clear and convincing evidence the present and continued incapacity of mother to provide essential care necessary for her child's physical and mental wellbeing.

4. The Trial Court abused its discretion and committed legal error in terminating mother's parental rights under 23 PA.C.S.A. §2511(a)(8) because the Department of Human Services failed to prove by clear and convincing that the conditions which led to the child's placement continue to exist.

5. The Trial Court did err in terminating mother's parental rights since the Department of Human Services did not meet its burden by clear and convincing evidence of showing that the best interest of the child was served by terminating mother's parental rights pursuant to Section 2511(b) of the Adoption Act.

6. Father reserves the right to amend the Concise Statement of Errors Complained of on Appeal after reviewing the transcripts of the hearing on April 21, 2023.

7. The Trial Court erred in law and/or abused its discretion when it changed the child's goal from reunification to adoption without clear and convincing evidence.

---

[3] Counsel for Appellant represents Father in this case, not Mother. Counsel for Appellant indicated that the issues raised pertaining to Mother in her Concise Statement of Matters Complained of on Appeal were the result of a typographical error. Counsel for Appellant indicated that she would correct the error with the Court. However, to date, Counsel for Appellant has not filed an amended Concise Statement of Matters Complained of on Appeal.

For the purposes of this opinion, Father's issues 1 through 7 will be consolidated to read: Did the trial court err when it involuntarily terminated Father's parental rights and changed the Children's permanency goals to adoption? Did the trial court err when it found that it would be in the best interest of the Children to terminate Father's parental rights pursuant to 23 Pa. C.S.A §2511(b)?

## IV.  STANDARD OF REVIEW

The proper standard of review when considering a trial court's determination of a petition to terminate parental rights is abuse of discretion. This standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re R.J.T.*, 608 Pa. 9 A.3d 1179, 1190 (2010). "An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused." *Bulgarelli v. Bulgarelli*, 934 A.2d 107, 111 (Pa. Super. 2007). Additionally, in order to affirm, an appellate court need only agree with the trial court as to any one subsection of § 2511(a), as well as § 2511 (b). *In re B.L.W.*, 843 A. 2d 380, 384 (Pa. Super. 2004).

Our standard of review of dispositional orders in juvenile proceedings is settled. The Juvenile Act grants broad discretion to juvenile courts in determining appropriate dispositions. *In re C.A.G.*, 89 A.3d 704, 709 (Pa. Super.2014). Indeed, the Superior Court will not disturb the lower court's disposition absent a manifest abuse of discretion. *In the Interest of J.D.*, 798 A.2d 210, 213 (Pa. Super. 2002). Appellate review of a weight of the evidence claim is limited to a review of the judge's exercise of discretion. See *Commonwealth v. Widmer*, 689 A.2d 211 (Pa. 1997), and *Commonwealth v. Brown*, 648 A.2d 1177, 1189-1192 (Pa. 1994).

10

## V.   DISCUSSION

### A. The Trial Court Properly Found that DHS met its Burden by Clear and Convincing Evidence to Terminate the Parental Rights of Father Pursuant to 23 Pa. C.S.A. §2511(a)(1), (2), (5), and (8)

Father alleges in his Concise Statement of Matters Complained of on Appeal, that this Court erred when it found that there was clear and convincing evidence that Father's parental rights should be terminated. This Court disagrees.

Under Pennsylvania law, the burden of proof is on the party seeking termination of parental rights to establish, by clear and convincing evidence, the existence of grounds for termination. *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003). It is well established that courts must examine the circumstances of each case and consider all explanations provided by the parent facing involuntary termination of his or her parental rights "to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *Id.* Clear and convincing evidence has been defined as testimony by credible witnesses who clearly relate facts that are so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction without hesitance of the truth of precise facts in issue. *In Interest of J.M.*, 166 A.3d 408, 427 (Pa. Super. 2017) (citing *In re Novosielski*, 992 A.2d 89, 107 (Pa. 2010)).

This Court found that grounds for involuntarily termination of Father's parental rights existed pursuant to 23 Pa. C.S.A. §2511(a)(1), (2), (5), and (8) and §2511(b). This Court will address each subsection separately.

### 1. This Court Properly Terminated Father's Parental Rights Pursuant to §2511(a)(1) of the Adoption Act

With respect to 23 Pa. C.S.A. §2511(a)(1), Pennsylvania law provides that the rights of a parent may be involuntarily terminated after a petition has been filed if:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child

11

or has refused or failed to perform parental duties. 23 Pa. C.S.A. §2511(a)(1).

Under these facts and circumstances, this Court found clear and convincing evidence that Father demonstrated a settled purpose of relinquishing parental claim to the Children and failed to perform his parental duties. The Children have been in foster care since they were adjudicated dependent over three years ago in February 2020. C.R. has resided with the current foster parents since she was adjudicated dependent and A.R. has resided there since August 2022. Father's failure to perform parental duties since the Children's placement was demonstrated by his failure to fully or substantially comply with his SCP objectives prior to when the petition to terminate his parental rights was filed on August 22, 2022. Throughout the case, Father's compliance with his SCP objectives has been minimal. Father's progress toward alleviating the circumstances which brought the Children into care has also been minimal. Father was also rated noncompliant and having made no progress at some Permanency Review Hearings. When the Children came into DHS care in 2020, Father's whereabouts were unknown to DHS/CUA. Once Father made his whereabouts known, SCP objectives were developed to facilitate reunification with him. CUA Director, Ms. Estevez, testified that Father did not engage in or complete any ARC services including parenting, housing, or employment despite referrals made for such services. Father was discharged from Family School in 2022 due to noncompliance. The testimony reflects that Father attended a BHS evaluation in March 2021, which recommended that Father receive mental health treatment as well as IDS. Father failed to follow the recommendations of the BHS evaluation in that he has not engaged in any mental health treatment or IDS. Additionally, the testimony reflects that while Father's home is structurally appropriate, Father resides with his sister who is his full-time caregiver. Father consistently visited the Children, but these visits are supervised weekly and have never progressed further. Ms. Estevez testified that Father was never offered

12

unsupervised visits with the Children due to concerns regarding his ability to keep the Children safe. The testimony further reflects that the Children have complex medical and therapeutic needs. Father has not attended any medical appointments throughout the case despite being court-ordered to do so.

Fully complying with his SCP objectives would have demonstrated Father's interest in caring for the Children. However, prior to the filing of the TPR petitions in August 2022, Father made minimal effort to fulfill these objectives. Accordingly, this Court found that termination of Father's parental rights was warranted pursuant to §2511(a)(1).

## 2. This Court Properly Terminated Father's Parental Rights Pursuant to §2511(a)(2) of the Adoption Act

When terminating parental rights pursuant to §2511(a)(2), the moving party must prove by clear and convincing evidence:

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
> 23 Pa. C.S.A. §2511(a)(2).

This ground for termination is not limited to affirmative misconduct. It may include acts of refusal to perform parental duties but focuses more specifically on the needs of the child. *In re Adoption of C.A.W.*, 683 A.2d 911, 914 (Pa. Super. 1996). Section 2511(a)(2) of the Adoption Act focuses on the child's present and future need for essential parental care, control, or subsistence necessary for their physical or mental well-being. *In re Adoption of M.J.H.*, 501 A.2d 648, 654 (Pa. Super. 1985). Even if a parent demonstrated love for their child or makes efforts to perform their duties, if a parent's incapacity cannot be remedied, their parental rights may be terminated. *Id.*

13

Applying §2511(a)(2) to this case, it is clear that DHS met its burden of demonstrating that termination of Father's parental rights and changing the Children's goals to adoption was proper. The Children were brought into care in February 2020 based on concerns regarding Mother and Father's ability to provide them with proper parental care and control. At that time, Father's whereabouts were unknown, and he was not involved in the Children's care. Father's incapacity under §2511(a)(2) existed given that Father failed to demonstrate a concrete desire or ability to remedy the conditions that led to the Children's placement. Father failed to comply with the recommendations from his BHS evaluation in March 2021 and has never engaged in mental health treatment or IDS. Father's BHS evaluation also showed that Father had an IQ of around 64. Father also requires a caretaker of his own, which raised concerns for his ability to care for the Children and keep them safe. Father's mental health and parenting capacity were the primary dependency concerns with respect Father. Father also failed to attend any medical appointments for the Children or engage in any ARC services. Additionally, Father's visits with the Children have never progressed beyond supervised weekly at the CUA agency due to safety concerns. He was also discharged from Family School in 2022 due to noncompliance.

This Court found that Father's failure to fully or substantially comply with his SCP objectives left the Children without the essential parental care, control, and subsistence necessary for their physical or mental well-being, and the cause of such neglect, refusal, and continued incapacity would not be remedied by Father. The Children have been in DHS care since February 2020 and have spent over three years outside the care and control of Father. Father's compliance with his SCP objectives was minimal at most, and he has made minimal to no progress toward reunification with the Children. For these reasons, the Court found that clear and convincing evidence existed to justify the involuntary termination of Father's parental rights pursuant to §2511(a)(2).

14

### 3. This Court Properly Terminated Father's Parental Rights Pursuant to §2511(a)(5) and (8) of the Adoption Act

As the requirements for terminating parental rights under §2511(a)(5) and (8) are similar, this Court will address them simultaneously. To terminate parental rights pursuant to §2511(a)(5), the petitioner must prove that:

> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. 23 Pa. C.S.A. §2511(a)(5).

DHS, as a children and youth agency, is not required to extend services beyond the period of time deemed as reasonable by the legislature. A child's life cannot be put on hold in hope that the parent will summon the ability to handle the responsibilities of parenting. *In re J.T.*, 817 A.2d 505, 509 (Pa. Super. 2001). The Pennsylvania Superior Court has recognized that a child's needs and welfare require agencies to work toward termination of parental rights when a child has been placed in foster [kinship] care beyond reasonable temporal limits and after reasonable efforts for reunification by the agency have been ineffective. *In re N.W.*, 859 A.2d 501, 508 (Pa. Super. 2004).

In order to terminate parental rights under §2511(a)(8), the petitioner must prove that:

> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child. 23 Pa. C.S.A. §2511(a)(8).

Unlike §2511(a)(5), termination under §2511(a)(8) does not require an evaluation of a parent's willingness or ability to remedy the conditions that initially led to placement. *See In re Adoption of R.J.S.*, 901 A. 2d 502, 511 (Pa. Super. 2006) (citations omitted).

In this instant case, this Court determined that DHS satisfied the requirements of Sections §2511(a)(5) and (8). C.R. was born on October . 2014, and is currently 8 years old. A.R. was born on May . 2018, and is currently 5 years old. They have been in the continuous care of DHS since they were adjudicated dependent in February 2020. At that time, Father's whereabouts were unknown. C.R. has resided with her current caregiver for the life of the case and A.R. began residing there in August 2022. When Father made his whereabouts known, SCP objectives were established for Father to reunify with the Children. Since the Children have been in placement, Father has made minimal to no progress to alleviate the circumstances that brought the Children into care despite attempts by CUA to facilitate reunification. Father's compliance with his SCP objectives was minimal at most, but he was also rated as noncompliant at some Permanency Review Hearings. The Children have been in care for over three years, which is much longer than the statutory period requires. They have spent over three years outside the care and control of Father.

Throughout the case, Father's mental health and parenting capacity have been the primary dependency concerns preventing reunification with Father. Father failed to alleviate these concerns by failing to engage in mental health treatment or IDS. The testimony also reflects that Father currently resides with his sister who is his full-time caregiver due to his mental health concerns. Father also failed to complete a parenting course through ARC and was discharged from Family School in 2022 due to noncompliance. While Father consistently visited the Children, his visits never progressed to unsupervised. Ms. Estevez testified that Father's visits were never expanded due to concerns regarding Father's parental capacity and ability to keep the Children safe.

16

The evidence reflects that Father has been minimally compliant with his SCP objectives at best, and no progress has been made to enable reunification of the Children with Father. Father has failed to complete his SCP objectives to alleviate the need for placement. As a result, this Court believes that Father will not remedy the conditions that led to the Children's placement within a reasonable time. The Children deserve permanency and should not wait indefinitely. Moreover, the evidence clearly established that termination would best serve the needs and welfare of the Children. C.R. has resided with the foster parents for over three years and A.R. has resided with them for almost one year. These siblings are placed together. They are well-adjusted, happy, and thriving in the foster parents' home. They have a strong bond with the foster parents whom they look to for safety and stability. They look to the resource parent to meet their basic needs as well as their complex medical and emotional needs. On the contrary, Father has failed to attend a single medical appointment for the Children to better understand their medical and therapeutic needs. Thus, this Court properly terminated Father's parental rights pursuant to both §2511(a)(5) and (8).

## B. The Trial Court Properly Found that it Would be in the Best Interest of the Children to Terminate the Parental Rights of Father Pursuant to §2511(b)[4]

Having found that the statutory grounds for termination of Father's parental rights have been satisfied pursuant to 23 Pa. C.S.A. §2511(a), this Court further found that termination of Father's parental rights serves the best interests of the Children pursuant to §2511(b).[5]

Under §2511(b), the party seeking termination of parental rights must prove by clear and convincing evidence that termination is in the best interest of the child. *In re Bowman*, 436 Pa.

---

[4] 23 Pa. C.S.A. § 2511(b). Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
[5] *See In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) ("Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second of the analysis pursuant to Section 2511(b)").

17

Super. 647 A.2d 217, 218 (1994). In determining the best interest of the child, courts must consider both the needs and welfare of the child such as love, comfort, security, and stability. *Id.* See also *In re Adoption of T.T.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). Furthermore, the parent-child relationship is examined in order to determine what effect the potential termination would have on the child. *In re K.Z.S.*, 946 A.2d 753, 760 (Pa. Super. 2008). Typically, when examining the nature of the parent-child relationship, courts must consider whether there is a natural bond between the child and parent, and if termination of parental rights would sever "an existing, necessary, and beneficial relationship." *Id.* At 761. In assessing the parental bond, the trial court is permitted to rely upon the observations and evaluations of social workers. In cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *Id.* at 762-63.

Section 2511(b) of the Adoption Act contains evidentiary limitations. The last sentence sets forth an exclusion clause which states, "With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." In *In re D.W.*, the Court held that this exclusion clause within §2511(b) barred the trial court from considering mother's post-petition conduct. *In re D.W.*, 856 A.2d 1231, 1234 (Pa. Super. 2004). Based on the evidentiary limitations set out in §2511(b), this Court is not obligated to consider any efforts made by Father to remedy the conditions that led to the Children's placement that were first initiated after Father was given notice that the petition to terminate his parental rights had been filed.

Based on the evidence, this Court determined that the Children would not suffer any irreparable harm if Father's parental rights were terminated. They have been in DHS care since they were adjudicated dependent in February 2020. C.R. has resided with the foster parents since her adjudication and A.R. was place in the same home in August 2022. The Children are 8 and 5 years

18

old and have spent over 3 years outside of the care and control of Mother and Father. There was compelling testimony presented at the TPR hearing that while the Children know Father is their biological father, they do not share a parent-child bond with him. The testimony also reflects that while the Children enjoy their visits with Father, they view him a visitation resource as opposed to a caregiver. Furthermore, Father's visits with the Children continue to be supervised and have never progressed to unsupervised throughout the case due to concerns that Father is unable to keep them safe.

In determining the best interest of the child, this Court must consider both the needs and welfare of the child such as love, support, care, and comfort. The Children do not look to Father to meet these needs. Instead, the Children look to the foster parents to meet these needs. They also look to the resource parent to meet their basic needs as well as for safety and stability. The foster parents, not Father, have attended to the Children's complex medical and therapeutic needs throughout the case. Father has not attended a single medical appointment. Ms. Estevez testified that the Children have developed a close relationship with the foster parents and share a parent-child bond with them. She testified that the Children refer to the foster parents as "mom" and "dad." They are doing excellent in the home and are well-adjusted in this pre-adoptive placement. TPR Counsel for the Children as well as Ms. Estevez stated that the Children wish to be adopted by the current resource parent who has been their most consistent caregiver for the last three years. Additionally, the testimony reflects that Father never contacted CUA regarding the Children's medical appointments or to inquire about their wellbeing. For these reasons, Ms. Estevez testified that goal best suited to meet the Children's developmental, physical, and emotional needs and welfare was adoption.

Clear and convincing evidence has been presented to establish that there would be no irreparable harm caused to the Children if this Court terminated Father's parental rights. The

19

Children deserve permanency and should not wait indefinitely. For these reasons, this Court properly found that it would be in the best interests of the Children to grant DHS's petition to terminate the parental rights of Father pursuant to §2511(b) and for the Children's permanency goals to be changed to adoption.

## VI.   CONCLUSION

For these reasons, this Court respectfully requests that the Order dated April 21, 2023, Terminating Father's Parental Rights and changing the Children's permanency goals to adoption, be AFFIRMED.

BY THE COURT:

Date: _June 8, 2023_

_[signature]_

Cateria R. McCabe, Judge

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing OPINION has been filed and served upon the following parties, as set forth below:

**PACFILE**

**Guardian Ad Litem:**
Gracen Eiland, Esquire
Defender Association of Philadelphia – Child Advocacy Unit
1441 Sansom Street, 9th Floor
Philadelphia, PA 19102

**Child Advocate:**
Carla A. Beggin, Esquire
1800 JFK Blvd., Suite 300
Philadelphia, PA 19103

**Counsel for Father:**
Tracey Chambers Coleman, Esquire
6150 N. Broad St., #49105
Philadelphia, Pennsylvania 19141

**Counsel for Mother:**
John J. Capaldi, Esquire
1812 Fox Chase Rd.
Philadelphia, PA 19152

**Trial Counsel for DHS:**
Keitshawna Williams, Esquire
Law Department, Child Welfare Unit
1515 Arch Street, 16th Floor
Philadelphia, PA 19102

**Appellate Counsel for DHS:**
Kathleen Bola Kim, Esquire
Law Department, Child Welfare Unit
1515 Arch Street, 16th Floor
Philadelphia, PA 19102

**Appellate Counsel for DHS:**
Robert D. Aversa, Esquire
Law Department, Child Welfare Unit
1515 Arch Street, 16th Floor
Philadelphia, PA 19102

June 8, 2023
Date

Cateria R. McCabe, Judge